IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 16-28479 |
| | ) | |
| NICOLA A. BRIGHT, | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | Hon. Deborah L. Thorne |
| CHICAGO & VICINITY LABORERS' | ) | |
| DISTRICT COUNCIL PENSION FUND, et al., | ) | Adv. Pro. No. 16-00705 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| NICOLA A. BRIGHT, individually, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Chicago & Vicinity Laborers' District Council Pension Fund and the Chicago & Vicinity Laborers' District Council Welfare Fund, Catherine Wenskus and Deborah French for Laborers' Pension Fund and the Laborers' Welfare Fund of the Health and Welfare Department of the Construction (the "Funds") and General Laborers' District Council of Chicago and Vicinity, James Jorgensen and Pat Shales (the "Union") hold a money judgment against Nicola A. Bright.[1] Nicola filed a chapter 7 petition in September 2016 seeking to discharge the money judgment as an unsecured debt.

Several months later, the Funds and the Union filed a complaint seeking an order that their claims against Nicola are nondischargeable under 11 U.S.C. Sections 523(a)(2)(A), (B) and

---

[1] Fox Valley Laborers' Health and Welfare Fund, the Fox Valley Laborers' Pension Fund and Pat Shales, not individually, but as Administrator of the Fox Valley Funds and the Construction and General Laborer's District Council of Chicago and Vicinity were original plaintiffs but on August 30, 2023, the court entered an order substituting the Chicago & Vicinity Laborers' District Council Pension Fund and the Chicago & Vicinity Laborers' District Council Welfare Fund, Catherine Wenskus and Deborah French for Laborers' Pension Fund and the Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, James Jorgensen and Pat Shales.

(a)(4).  In August 2023, the matter was tried.  Only two witnesses, Nicola and Roy Augustine, testified. After considering the non-disputed facts, the testimony at trial, the credibility of the witnesses and the admitted exhibits, the court finds that the Union and Funds' claims against Nicola Bright are nondischargeable under section 523(a)(2)(A) and 523(a)(4).

## I. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). Cases brought under 11 U.S.C. § 523 are core proceedings under 28 U.S.C. § 157(b)(2)(I) and the court may enter a final judgment. *In re Smith,* 848 F.2d 813, 816 (7th Cir. 1988).

## II. Findings of Fact[2]

Prior to the trial on August 7, 2023, the parties entered a stipulated judgment order in Case No. 13 CV 7248 in the District Court for the Northern District of Illinois ("Judgment"). (Joint Pretrial Statement ("Pretrial Statement"), Dkt. No. 92 ¶ 1.)  The Judgment provided that Nicola and others owed $610,898.23 to the Union and Funds based upon underreporting Union employee's wages and hours. (*Id.* ¶ 1) Nicola is jointly and severally liable for the judgment amount with the other defendants. (*Id.*)  Since the Judgment was entered, several other parties have made payments resulting in a claim against Nicola of $495,680.10 plus post-judgment interest (the "Claim"). (*Id.* ¶ 2.)  The Judgment did not contain any findings related to whether Nicola had committed fraud under section 523 and the issue before this court is now whether the Claim against her is nondischargeable. (*Id.* ¶ 4.)

---

[2] The facts are taken from the Joint Pretrial Statement (Dkt. 92), Joint List of Exhibits (Dkt. 91), all of which were admitted, and the testimony presented during the hearing on August 7, 2023.

2

Nicola is the President and 100 percent shareholder of Route 66 Construction Company ("Route 66"). (*Id.* ¶ 11.)  Her husband, Robert Bright previously operated a similar construction and excavating company and later formed Route 66 naming Nicola president and sole shareholder.  Route 66 is a party to The Construction & General Laborers' District Council of Chicago and Vicinity Independent Construction Industry Collective Bargaining Agreement (the "Agreement"). (Dkt. No. 91, Ex. 1.)  Under the terms of the agreement, Route 66 agreed to

> [d]educt from the wages of employees uniform initiation fees, assessments, membership dues, and working dues in the amount of 2.75% of gross wages or such other amount as directed by the Union, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from who dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made.

(Dkt. No. 91, Pls.' Ex. 1, ¶ 4.)

In addition, Route 66 agreed to pay other amounts under the Agreement to the Funds and to

> [b]ecome bound by and considered a party to the agreements and declarations of trust creating the Funds as if it had signed the original copies of the trust instruments and amendments thereto.  The Employer ratifies and confirms the appointment of the employer trustees who shall together with their successor trustees, carry out the terms and conditions of the trust instruments.  The Employer further affirms that all prior contributions paid to the Welfare, Pension, Training and other Funds were made by duly authorized agents of the Employer at all proper rates, and evidence the Employer's intent to be bound by the trust agreements and Collective Bargaining Agreements in effect when the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable collective bargaining agreements.

(Dkt. No. 91, Pls.' Ex. 1, ¶7.)

Nicola had no experience in construction, payroll or union matters.  She worked in the Route 66 office and was responsible for payroll operations as well as preparing and submitting reports to the Funds and the Union (Pretrial Statement, ¶¶ 12-14).  Robert ran the excavating business for Route 66 and another company, Ryan Excavating, also owned by him. ( *Id.*¶ 42). Each week Nicola received reports from the field listing the hours worked for each employee. (*Id.* ¶ 14.) To prepare the reports for the Union and the Funds, Nicola reviewed the hour reports and filled out forms for the Union and the Funds to calculate the proper amounts to remit to the Union and the Funds. (*Id.* ¶¶ 12-13.)

Route 66 experienced financial difficulties and Nicola began preparing and/or supervising the preparation of reports submitted to the Union and underreported employee wages and hours which minimize or avoid Route 66's obligations under the Contract. (*Id.* ¶¶ 12-13, 34.)  No evidence was submitted that the reports were not prepared under her supervision.  Each dues report form submitted contained the following warranty:

> **EMPLOYER'S WARRANTY AND ACCEPTANCE:**  By the submission of this report, Employer expressly warrants and affirms that this report accurately states all hours worked by all of Employer's laborer employees.  By submitting this report, the Employer hereby accepts, adopts and agrees to be bound to the terms and conditions of the Independent Construction Industry Collective Bargaining Agreement with the Construction and General Laborers District Council of Chicago and Vicinity (the "Union" and any extension, renewal, modification or amendment (sic) to that Agreement.

(Dkt. No.91, Pls.' Exs. 2-6.)

In addition, Nicola prepared benefit contribution reports to the Funds, submitting them on the tenth day of the month following the month in which covered work was performed, identifying the number of hours worked by individuals who performed covered work under the terms of the Agreements. (Pretrial Statement ¶¶ 6, 12-13.)  She took the total hours worked and

4

multiplied them by a formula. (*Id.,,* ¶¶12-13.) Nicola warranted that each submitted benefit

report form was accurate through the following statement:

> **EMPLOYER'S WARRANTY AND ACCEPTANCE:** The undersigned
> employer hereby warrants that this report accurately states all hours worked by all
> laborers in its employ. In addition, the employer hereby agrees to be bound to the
> terms of the current collective bargaining agreement executed between the
> Construction and General Laborers' District Council of Chicago and Vicinity and
> the relevant Multi Employer Associations. Further, the undersigned hereby
> expressly accepts and agrees to be bound by the trust agreements governing the
> Laborers' Pension and Welfare, et al. and accepts all of the terms thereof with the
> intention of providing benefits to its laborers.

(Dkt. No. 91, Pls.' Ex. 2.)

The Agreement signed by Route 66 gave the Union and the Funds the right to conduct

periodic audits of Route 66's books and records. (Pretrial Statement, ¶ 10.) Through the audits,

the Union and the Funds determined that the hours identified as owed under payroll records were

not accurate and were underreported. (*Id.* ¶ 16.) The Judgment included a summary of the

thousands of hours that were not reported to the Funds (*Id.* ¶ 34.) Many employees' hours were

underreported, and certain reimbursements were attributed to employees who had no expenses to

be reimbursed.[3] All of this was part of a pattern of submitting false records and under reporting

hours discovered by the Union during the audit. (Dkt. No. 92, ¶¶ 33-41, 44-64).

---

[3] Route 66 was in the habit of reimbursing employees for fuel or other material purchased in connection with their employment. To further defraud the Union and to avoid upsetting employees, Route 66 fabricated reimbursements by reimbursing employees for expenses that were not incurred by the specific employee. (Dkt. No. 92, ¶ 16.) Although Route 66 challenged the disbursement findings asserting that those payments were not made to compensate employees for hours worked, but were made to reimburse employees for expenses, a review of the receipts demonstrated that many receipts were identical and attributed to employees that had no expenses requiring reimbursement. Instead, the falsification of expenses, allowed Route 66 through the actions of Nicola to further defraud the Union and Funds as expense reimbursements did not trigger additional payments owed to the Union and Funds. (Dkt. No. 92, ¶¶ 20-30.)

At trial, one of the supervisors, Roy Augustine[4] testified under oath for the Union that he discovered the underreporting of hours when the Union contacted him to tell him that he was about to lose his union insurance because he did not have sufficient hours.  He knew that he had worked enough hours and complained to Nicola and Robert about the underreporting.  Robert gave him an additional check or cash to supplement his pay to provide him with the proper compensation.  Robert told him they were behind on submitting reports and altered Roy's hourly report to the Union and paid the difference in cash.  As supervisor for his flat work crew, Roy maintained timesheets for the entire crew and would turn them in on Wednesday to Nicola. Even after the original complaint, the "underreporting" continued; Roy would call the union to see what hours were needed and then would complain to Robert.  Robert would then add enough hours to make Roy eligible for union insurance.

Roy further testified that around the same time, Route 66 started paying employees in cash.  The cash payments came directly from Robert and Nicola.  Roy would go to the office to gather the checks for his entire crew and realize that his payment was short.  He would return to Nicola or Robert and complain.  Then, he would receive the remainder due in cash.  He testified that he received many payments in cash and could tell from the envelopes that other employees were being paid in cash as well.  On several occasions, Roy watched as Robert and Nicola counted the cash in front of him prior to placing it in the payroll envelopes.  Roy testified that he told Robert and Nicola that he did not want payments in cash but wanted the union credit for actual hours worked so that he would have insurance and the pension that came with union membership.

---

[4] Roy testified during the trial under a subpoena issued by the Plaintiffs.

6

Roy further testified that at some point, he started receiving payroll checks from Ryan Excavating, a non-union company owned by Robert.  At the time, he assumed that Route 66 had changed its name.  He never signed a W-4 for Ryan and did not believe he was a Ryan employee.  The cash payments and the payments that went through Ryan were not reflected on W-2 reports issued by Route 66 and were not included in the Route 66 reports to the Union and the Funds.

Another ploy used by Route 66 to avoid full reporting of hours worked on the Union dues and the Funds' reports was to submit forms showing "no hours worked" for Route 66, when in fact the Route 66 employees were being paid through the Ryan Excavating payroll account. (Pretrial Statement, ¶¶ 38-46, 52-61, 63-64.)  During this period, Ryan Excavating was not reporting to the Union or to the Funds. (*Id.*)  Other employees worked for Route 66 and were paid through the payroll of Route 66 but were not identified as such on the reports submitted to the Union and the Funds, again depriving the Union and the Funds of the amounts owed to them on behalf of the employees.  (*Id.* ¶¶ 47 -51, 62).

### III.   Discussion

#### A.   Plaintiff has the Burden of Proof

The Union and the Funds have the burden of proof in this action and must demonstrate that their claims are nondischargeable.  The Supreme Court clarified the burden of proof for claims under section 523 actions in *Grogan v. Garner*, 498 U.S. 279 (1991) and explained that plaintiffs must show their claims are nondischargeable using the preponderance-of-the-evidence standard.

**B.   The Union and Funds Claims are Nondischargeable under Section 523(a)(2)(A)**

Section 523(a)(2)(A) provides an exception to the general discharge if the creditor is able to demonstrate by a preponderance of the evidence that "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010). "False representation" refers to express misrepresentations, either oral or written. *In re Haskell,* 475 B.R. 911, 920 (Bankr. C.D. Ill. 2012). False representations concerning payments to subcontractors, including amounts that are attributable to benefit funds, have been found to be nondischargeable. *Id.* at 920-21 (holding that affirmative representations that all employees had been paid, including benefit payments, when they were not, was sufficient to establish knowing or reckless false representations which the debtor knows or should know will induce another to act and an intent to deceive may be inferred). Similarly, the false representations to the Union and the Funds are nondischargeable.

Plaintiffs in this case demonstrated by a preponderance of the evidence that false monthly dues reports were submitted underreporting employee hours worked. Nicola received the hour reports from the field and created or supervised each report submitted to the Union and Funds. No evidence was presented that Nicola received inaccurate reports from the field. Nicola submitted each false report, knowing that it contained misrepresentations intended to underpay and deceive the Union and Fund. To further disguise the fact that she was submitting the false reports while warranting their truthfulness, she prepared payroll partly in cash and partly in false reimbursement of expenses. Thus, the amount of the employees' checks reported contained false representations of the actual hours and wages owed.

8

Nicola testified that she never paid employees in cash, but she was simply not credible, and her statement was contradicted by Roy. Nicola appeared to be intelligent and testified that she was involved on some basis on another business out of her farm. She testified that Route 66 was in financial trouble and that she "loaned" it funds and later withdrew them as cash was available. She clearly wanted to support her husband and desired to make Route 66 a viable entity. Roy was not only concerned with his own eligibility for insurance and his pension, he was concerned that his field staff were also receiving payments in cash and that hours reported were false. The audit revealed the falsification of the expense reimbursements, and no evidence was presented to demonstrate that the reports were accidently created. It was quite clear to the court that the reports were intentionally created, and records were manipulated and falsified to cover the underreporting.

In addition, Roy's testimony was supported by the agreed upon facts submitted in the Joint Pretrial Statement (Dkt. No.92 ¶ 52.) The Union and Funds justifiably relied upon the information that was contained in each report which was warranted by Nicola.

The Union audit also demonstrated that false reports of hours and wages were made to the Union and Funds. (Dkt. No. 91, Pls.' Exs. 13-18.) There was no evidence that the audit was inaccurate and in fact the stipulation, which is part of the District Court Judgment, used the audit's numbers to determine the judgment amount, showing an agreement between parties that the underreporting was accurate. (Dkt. No. 91, Def.'s Ex. 3.) The Union and the Funds are entitled to an order that their claims are nondischargeable under section 523(a)(2)(A).[5]

---

[5] The Union and Funds also seek an order that their claims are nondischargeable under section 523(a)(2)(B). The court is unable to find nondischargeability under this section as the reports did not state the financial condition of Nicola or even Route 66 and thus, subsection (ii) is not met. As each prong must be met, the Plaintiffs fail to prove their claims are nondischargeable under section 523(a)(2)(B).

**C.   The Claims are Nondischargeable under Section 523(a)(4)**

Although the court finds that the Union and Funds' claims are nondischargeable under § 523(a)(2)(A) and nothing more is needed to find the instant claims are nondischargeable, the claims are also nondischargeable under § 523(a)(4).  Section 523(a)(4) of the Bankruptcy Code provides that a "discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).  The Union and the Funds object to the discharge of the money judgment debt because, they assert, it arises from fiduciary defalcations committed by the Nicola.

The Supreme Court has held that to prevail on a claim of nondischargeability under section 523(a)(4), the burden is on the party claiming nondischargeability, and that party must meet its burden by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991).  "Exceptions to discharge under Section 523(a) must be strictly construed in favor of the debtor to comply with the 'fresh start' policy underlying the Bankruptcy Code." *In re Duncan,* 331 B.R. 70, 76, (Bankr. E.D. N.Y. 2005); *see also Grogan*, 498 U.S. at 286.

The Seventh Circuit has stated that a creditor must satisfy two elements to invoke the section 523(a)(4) exception to the dischargeability of a debt. *In re Jahrling*, 816 F.3d 921, 925 (7th Cir. 2016). The elements are that "(1) 'the debtor acted as a fiduciary to the creditor at the time the debt was created,' and (2) 'the debt was caused by fraud or defalcation.'" *Id.* (quoting *In re Berman*, 629 F.3d 761, 765-66 (7th Cir. 2011)).

**1.   The Debtor Acted as a Fiduciary to the Creditor at the Time the Debt Was Created**

Bankruptcy courts have found ERISA-covered employee benefit plans to constitute trusts for purposes of section 523(a)(4). *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 78 (Bankr.

10

E.D.N.Y. 2005)*; Eavenson v. Ramey,* 243 B.R. 160, 166, (N.D. Ga. 1999) ("ERISA statutorily satisfies the elements of a technical trust under § 523(a)(4).") There seems to be no requirement that the employer have any role in the administration of the plan but may merely be in control of the funds which are due the union for dues or pension plans.

The term "fiduciary" under ERISA has been given a broad meaning. *Baker v. Kingsley,* 387 F.3d 649, 663-664 (7th Cir. 2004); *Mutual Life Ins .Co. of N.Y. v. Yampol,* 840 F.2d 421, 425 (7th Cir. 1988) ("this court's consistently broad reading" of the definition of an ERISA fiduciary); *Cent. Ill. Carpenters Health & Welfare Tr.t Fund v. S & S Fashion Floors, Inc.,* 516 F. Supp. 2d 931, 934 (C.D. Ill., 2007). A person is a fiduciary with respect to an ERISA plan, "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Courts examine the conduct of the alleged fiduciary vis-vis a plan's assets. *Cent. Ill. Carpenters Health & Welfare Tr. Fund*, 516 F. Supp. 2d at 934. Although ERISA does not define what constitutes an asset of an ERISA fund, the Department of Labor has instructed that, "[i]n general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest." *Navarre v. Luna,* 406 F.3d 1192, 1199 (10th Cir. 2005) (quoting Department of Labor Advisory Opinion No. 93-14A (May 5, 1993) 1993 WL 188473, at *4). Finally, the Department of Labor defines "plan assets" in its regulations as including "amounts (other than union dues) that a participant or beneficiary pays to an employer or amounts that a participant has withheld from his wages by an employer for contributions to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." *Cent. Ill.*

11

*Carpenters Health & Welfare Tr. Fund v. S & S Fashion Floors, Inc., 516 F. Supp. 2d* at 935

(quoting 29 C.F.R § 2510.3-102).

Nicola acted as a fiduciary in her capacity as president of Route 66.  She reviewed the

hours of each employee and withheld the dollars to be remitted to the Funds.  She apparently cut

the checks or in this case, placed cash in envelopes to compensate Route 66's employees for

their hours worked.  The withheld funds and the funds which were paid in cash and therefore not

reported were clearly assets of the respective ERISA pension funds.  She had control over the

assets and failed to send them on to the Funds.

**2. The Funds' Claims Arise From "Defalcations" Under the Bankruptcy Code**

Defalcation is not defined in the Bankruptcy Code and courts have differed as to whether

conscious misconduct must be shown to establish that a debt arises from a defalcation for

purposes of section 523(a)(4).   The Supreme Court considered the definition of defalcation in

*Bullock v. BankChampaign, N.A.* and writing for the Court, Justice Breyer explained defalcation

as follows:

> conduct that the fiduciary knows is improper but also reckless conduct of the kind
> that the criminal law often treats as the equivalent . . . . Where actual knowledge of
> wrongdoing is lacking, we consider conduct as equivalent if the fiduciary
> "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable
> risk" that his conduct will turn out to violate a fiduciary duty. That risk" must be of
> such a nature and degree that, considering the nature and purpose of the actor's
> conduct and the circumstances known to him, its disregard involves *a gross
> deviation* from the standard of conduct that a law-abiding person would observe in
> the actor's situation.

*Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275 (2013).

Nicola deviated from the standard of paying employees by check and reporting the wages

and the hours worked to the Union and the Funds, by underpaying the wages by check and

hiding this by paying a portion in cash.  This allowed her to underreport the hours worked and

12

underpay the Funds, thus violating her fiduciary duty by the defalcation.  She was in control of the funds and of the reports to the Union and Funds as she prepared the reports or approved the submittal to the Union and the Funds.  She counted out the cash and placed cash in the employee envelopes.  She also misrepresented the reimbursements for expenses to further cover the deviation in reporting the wages and submitted these to the Union, Funds, and auditors.  Each time she submitted a report to the Union and the Funds, she warranted the veracity of the report, turning a blind eye to the statement in each report warning her of her duty of candor.  Through all this conduct, she consciously disregarded the duty she had under the Union Contract and by extension, ERISA.  She is not entitled to discharge her debt under the Judgment.

## IV.    Conclusion

The Union and the Funds have demonstrated through a preponderance of the evidence that their claims are nondischargeable under 11 U.S.C. sections 523(a)(2)(A) and 523(a)(4).

ENTER:

Dated: October 17, 2023

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge

13